**James D. HODGSON, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**DISTRICT NUMBER FIVE, UNITED MINE WORKERS OF AMERICA, Defendant.**

Civ. A. No. 71–701.

United States District Court,
W. D. Pennsylvania.

Jan. 12, 1973.

Lloyd F. Engle, Jr., Pittsburgh, Pa., Joseph A. Yablonski, Clarice R. Feldman, Daniel Edelman, Washington, D. C., Kenneth J. Yablonski, Samuel Pangburn, Washington, Pa., for defendant.

Harland F. Leathers, Jr., Civil Div., Dept. of Justice, Washington, D. C., Bea Bloch, John Lamb, U. S. Dept. of Labor, Silver Springs, Md., Louis Weiner, Stephen K. Ernst, Office of Regional Sol., U. S. Dept. of Labor, Philadelphia, Pa.,

Richard L. Thornburgh, James M. Seif, Pittsburgh, Pa., for plaintiff.

## OPINION and ORDER

McCUNE, District Judge.

On July 23, 1971, the Secretary of Labor filed a complaint under Title IV of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401 et seq., seeking to set aside the December 8, 1970 election of United Mine Workers officers in District No. 5 of the United Mine Workers (hereinafter UMW) and obtain a new election under the supervision of the Secretary of Labor.

After refusing to grant summary judgment for the government by our opinion of May 25, 1972, in which we ruled that a trial on the merits would be required we tried the case non-jury in July and August of 1972.

For the reasons set forth hereinafter we now set aside the election in District No. 5 of the UMW which was held in December of 1970 and order a new election in that District under the supervision of the Secretary of Labor.

The election of officers in District No. 5 was ill fated from the beginning because of the wording of the District 5 constitution with respect to absentee ballots and in fact, with respect to the entire election process, and although the men who wrote the constitution no doubt thought it was sufficient for their purposes at the time it was written, intervening events caused a deep division within the union which placed the officers of District 5 in an untenable position as they tried to carry out the election of 1970 and demonstrated the invalidity of the constitution. It is unnecessary to review here the causes of the division within the union because they have been reviewed frequently in other proceedings. Suffice it to say that as the 1970 elections approached there were two slates of candidates in the field seeking election, one representing the incumbent candidates (on which the incumbents were running to succeed themselves) and an opposing group called the Miners for Democracy (hereinafter MFD). The bitterness between the two slates and their adherents cannot be overemphasized.

It had been provided in the constitution of District 5 adopted May 7, 1970, at Pittsburgh that the Secretary-Treasurer of the District should be in charge of mailing applications for absentee ballots and of receiving absentee ballots and maintaining custody of them while awaiting the counting of ballots by the official tellers. In the election in question, bitterly contested we repeat, the Secretary-Treasurer who had charge of the absentee ballots was himself a candidate running to succeed himself. And the President of District 5 was an incumbent candidate running to succeed himself. He was in charge of the District Office and his office was adjacent to the office of the Secretary-Treasurer of District 5. These facts alone made the MFD slate and all of its adherents highly suspicious of the Secretary-Treasurer and the President of District 5, who was known to be in favor with the International officers in Washington, D. C.

The situation created by the constitution placed the tellers in an equally impossible position. They were elected officers of the District also and the three official tellers were running for office and would be counting their own votes. Two of the tellers were running to succeed themselves. The third was running for Secretary-Treasurer against the incumbent Secretary-Treasurer, John Seddon.

To make matters worse, one of the tellers (Daniels, who was running for Secretary-Treasurer) was a candidate on the MFD slate and the two others were candidates on the incumbent slate. Needless to say, they could agree on nothing.

The constitution made no provision to remove incumbent candidates when their official duties created a conflict of in-

terest when they became candidates to succeed themselves.[1]

1. Pertinent provisions of the Constitution follow :

"Nominations and Elections

Section 1. The President, International Executive Board member, Secretary-Treasurer and tellers shall be elected by a plurality of the popular vote of members in good standing in the local unions of the district. . . . "

Sections 2, 3, and 4 put the Secretary-Treasurer in charge of the nomination process. (These sections need not be quoted in full.)

Section 6—provides for local union tellers and provides that local election returns shall be sent to the Secretary-Treasurer of the District who shall place the ballots in an unopened ballot box to await the count by District tellers.

"Sec. 7—Rule 1. Any member who finds it necessary to vote by absentee ballot may make application to the district secretary-treasurer no sooner than 45 days before, no later than seven days prior to, the date set for election.

Rule 2. Any member requesting an absentee ballot must have on the application or in the letter of request his name, social security number, address and local union number.

Rule 3. All absentee ballots in order to be counted must be returned to the district secretary-treasurer's office no later than 5:00 p. m. on the date set for the election.

Rule 4. The district secretary-treasurer upon receipt of a request from a member in good standing for an absentee ballot shall by certified mail send to the applicant an official ballot stamped 'Absentee' on the bottom of the face of the ballot, an inner envelope marked 'Ballot,' and a self-addressed outer envelope to be used for mailing. The inner envelope shall have instructions printed on it for the voter to place his ballot into this envelope for mailing. The outer envelope addressed to the district secretary-treasurer shall have in the left hand corner a place for the signature, local union number and address of the voter. Also printed on the outside envelope will be the word, 'BALLOT.'

Rule 5. The district secretary-treasurer upon receipt of the outer envelope with the ballot in it will deposit this outer envelope into a securely locked ballot box.

Rule 6. The district secretary-treasurer shall keep an official list of each applicant for an absentee ballot and no later than five days before the election must notify the recording secretary of each local union by certified mail as to each member of his local union who has applied for an absentee ballot.

Rule 7. The recording secretary must see to it that the name of each member of his local union who has applied for an absentee ballot is stricken from the rolls of those eligible to vote at the local union polling place.

Under no circumstances will a member whose name appears upon the absentee ballot list received from the district secretary-treasurer be permitted to vote at the local union polling place.

Sec. 8. The tellers shall meet at the district headquarters on the day of the election in sufficient time to commence the count of the absentee ballots at 10:00 a. m. They shall dispatch their duties in the following sequence.

Rule 1. They shall open the ballot box and check the validity of each outer envelope before opening it and removing the inner envelope.

Rule 2. The inner envelope shall be placed into another container.

Rule 3. After all of the inner envelopes have been removed, the ballot box shall again be locked and will be used for preserving the outer envelopes. The tellers shall then remove the ballots from the inner envelopes and commence the tabulation of the votes.

Rule 4. Any absentee ballots received by the district secretary-treasurer up until 5:00 p. m. on the day of the election shall be turned directly over to the tellers. The tellers will check the validity of the outer envelope and remove the inner envelope placing it with other unopened inner envelopes.

Rule 5. The tellers will take the necessary steps to insure the absolute secrecy of all absentee ballots including those arriving before 5:00 p. m. on the day of election.

Rule 6. Upon completion of the count of absentee ballots, a return sheet will be filled out and the correctness of the return sheet must be attested to by the tellers. The district secretary-treasurer must also attest to the correctness of the return sheet and place the district seal upon it.

Rule 7. In accordance with the federal laws each candidate may have one observer present during the count of absentee ballots, but no observer shall interfere with the work of the tellers.

Sec. 9. The tellers shall meet at district headquarters on the third Tuesday of December of each election year, by which time all votes must be in, and shall tabu-

The Secretary-Treasurer was suspected by the MFD adherents of rank par-

tiality and his duties made it possible for him to be partial. He had a list of all people who had requested absentee ballots and he was suspected of knowing the opinions of the people. He was in position to mail ballots to only those whom he thought would vote favorably or to mail ballots so late that they could not be returned in time for the election or to intentionally refrain from depositing in the ballot box a ballot he suspected of being adverse.

As will be observed later on the MFD people invaded the District Office to check on the Secretary-Treasurer and they did find absentee ballots piled on the desk of the Secretary-Treasurer which had not been placed in the supposedly locked ballot box designed to receive them. They were enraged by what they saw and their suspicions increased. (There was no proof that the Secretary-Treasurer was picking and choosing the absentee ballots he would deposit in the absentee ballot box and we are inclined to the view that he was not dishonest but his procedures were so poorly designed that there is no wonder that he was under suspicion. He was in an impossible position.)

The District tellers were assigned the duty to investigate and decide all local election contests. It was virtually impossible for them to investigate local complaints for many reasons. They were under suspicion from both sides. Local union members were unruly, acting in many cases in disorder and disarray, refusing to be rational. And the tellers having divided loyalty disagreed on the procedure they would employ in investigating reports of irregularity at the local level. Persons who were asked to testify were shouted down. In some cases a tape recorder was brought into the hearings creating an impasse when witnesses refused to be taped. Witnesses refused to appear and ignored the tellers.

The District tellers who met to perform their duties in District headquarters and in the field were confronted by mobs of men. Police had to be called to prevent open warfare upon occasion. The District Officers and the MFD sought the intervention of representatives of the Secretary of Labor in Pittsburgh who took custody of the absentee ballot boxes. (Custody was taken after election day and retained by the Labor Department until long after the election but this did not serve to cool tempers. Prior to the election (on December 1, 1970), the absentee ballots had been placed in the custody of a bank with the vain thought that this might restore confidence).

District 5 was composed of 69 local unions and 13,000 members located in 18 counties and the magnitude of the task of conducting a contested election in so vast an area was at first underestimated by the officers of District 5. The Secretary-Treasurer was poorly prepared and understaffed for the duties imposed on him by the constitution and was unable to handle the vast accumulation of detail which he had failed to foresee. The tellers had never contemplated the trouble which would result when many local election contests developed. As the summer of 1970 wore on the District President recognized the problems and asked that the Department of Labor su-

late the vote of all local unions including the absentee ballots in accordance with the provisions of the constitution. The tellers shall not count the votes of any local union that has cast more votes than the number of members such local paid per capita tax to the district office for the month preceding the one in which the election was held, unless a satisfactory explanation for so doing accompanies the 'return sheet' of the local union so voting.

As soon as the count is completed the district secretary-treasurer shall notify the secretaries of the various local unions of the result of the tellers' findings and the report so submitted shall be an official announcement of the election to the respective offices of the candidates receiving a plurality of legal votes as shown in the report. The district secretary-treasurer shall send to all local unions a tabulated report of the number of votes cast by each local union as soon as possible."

pervise the election, but the Department at that time decided to maintain its policy of staying out of the union's affairs and the union was left to its own imperfect devices.

The framers of the District Constitution had simply never foreseen the trouble which would result when incumbent candidates were allowed to remain in charge of the election process. As the trouble developed the District President having recognized the unfairness inherent in the process, invited the MFD leaders to send observers to the District office and for a few days prior to the election MFD observers did go to the office on an informal basis but there was no provision for such procedure in the constitution, no preparation for it and the observers came and went on an informal schedule as time permitted. What they observed only caused wider division between the factions.

The District tellers, as protests mounted in the locals over the manner of voting or of counting votes or preparing tally sheets, deferred to the District President asking him for interpretations and advice and while ordinarily he would have been permitted, under the constitution, to interpret and advise he was a candidate and every interpretation he made brought forth new suspicion, and new protest.

In response to the protests, a so called International Commission (men from the UMW headquarters in Washington, D. C.) came to the coal fields to assist the local officers in attempting to investigate election protests but the commission was ineffectual because the MFD adherents would not cooperate with the commission for obvious reasons. The UMW headquarters personnel was hated by the MFD adherents who considered the International officers to be in sympathy with the incumbent slate. The International officers were, in fact, in sympathy with the incumbent slate and had openly supported it in every way. One Mary Gross was the wife of an International official and she was the financial secretary for the group which raised the money to finance the incumbent slate. The group in charge of the money was known as the Pittsburgh Miner's Fund and the incumbent candidates drew expense money for their campaign from Mary Gross. Everyone knew Mary Gross and knew that her husband was a loyal employee of the International office. The office of the Pittsburgh Miner's Fund was on the floor below the District 5 office at 938 Penn Avenue in Pittsburgh and the people who operated the Pittsburgh Miner's Fund also had a campaign committee there (at 938 Penn Ave.) called the Pittsburgh District Miner's Committee which was a voluntary association of people interested in the incumbent slate. The people who manned the office of the Pittsburgh District Miner's Committee were all employees of the International union or closely associated with them and they all had free access to the District 5 offices one floor above. The help which the Secretary-Treasurer (John Seddon) did have available to assist him with the absentee ballots and the election process was composed of men employed by the International union. These men went back and forth between the campaign office and the District office. In fact, at least one of the men helping the Secretary-Treasurer with the absentee ballots was an officer of the Pittsburgh District Miner's Committee. It is no wonder that the MFD slate distrusted the International officers and the International commission and all of the District officers.

One further conflict of interest should be mentioned. The local unions also had tellers. Pursuant to Art. X, § 6 of the constitution the local union President and the Financial and Recording Secretaries of the locals were to act as local tellers. The local tellers were required to supervise the election on the local level and give assistance to voters who asked for it and prepare local election returns which were to be sent to the Secretary-Treasurer of District 5 not later than three days following the elec-

tion. The Secretary-Treasurer was to place these returns in a ballot box to await action by the District tellers. The accuracy of the return sheet sent by the local to the Secretary-Treasurer had to be attested to by the local union president and secretary. Note that the President of a local was a local teller and one who attested to the accuracy of the local vote. Certain of the candidates for District office were also local union Presidents who counted their own votes and attested to the accuracy of their own work.

With the conflicting interests thus set in place (and there may be others we have not been astute enough to observe) the election began to unfold. In theory, one who found it necessary to vote by absentee ballot might make an application for a ballot on which he was required to state his name, social security number, address and local union number (Art. X, § 7—Rules 1 and 2).

The Secretary-Treasurer who had a list of all union members, their addresses and social security numbers and whether their dues were currently paid did not wait for applications. He mailed an application to everyone along with a news letter explaining how one could vote by absentee ballot. Applications came in by "50's and 100's in every mail" and the overworked Secretary-Treasurer responded by mailing out ballots which were returned in great numbers which the Secretary-Treasurer piled on his desk. When he had made a personal notation on a legal pad of the ballots received he opened the ballot box from time to time (theoretically locked) and put the ballots in the box. His help (the International employees) had access to the ballots and the union member lists and all of the office files. It was easy to check who had already voted and call people who were friendly to ask that they send in a ballot because the ballots contained identification on an outer envelope.

The protests of the MFD mounted as the election approached. The District President, swamped in controversy and confusion, again asked the Department of Labor in Pittsburgh for help and advice. On December 1, 1970, William Kane of the Pittsburgh office met with District officers and offered the advice that the absentee ballot boxes should be placed in the custody of some bank. The advice was accepted and following December 1, 1970, the absentee ballots already deposited in the ballot box were kept in the custody of Western Pennsylvania National Bank in Pittsburgh. Continued protests to the Labor Department resulted in the Labor Department taking custody of all absentee ballots on December 14, 1970, following the election.

The ballots were subjected to an examination by the government to determine whether any of them had been altered and it was reported by the Labor Department to the Union that no evidence had been found of alteration or tampering. However, it was February of 1971 before the absentee ballots were returned to the Union and, of course, they had never yet been counted by the tellers who were still in disagreement whether they should ever be counted. There were 1370 absentee ballot applications received of which 1189 came by mail and 181 were delivered by hand. The tellers counted 1182 absentee votes.

It was not until July 23, 1971, that the tellers finally decided to count the absentee ballots and the count was begun. Of course, meanwhile, on the basis of the votes counted the incumbent slate of officers considered that they had won the election and were still in office operating the union (on the basis of a count by the tellers made March 19, 1971, reported to the District on March 31, 1971.)

However, protests were outstanding with respect to the voting at seven local unions which it is unnecessary to list here. As the weeks went by following the election and as the Department of Labor and the International Commission assisted in cooling the tempers of the

tellers and their adherents, all of the local unions whose votes had not been counted were finally counted by agreement of the tellers except for Local No. 1248 which has never yet been counted. As late as March 18, 1971, however, the tellers were attempting to investigate protests from the locals without success because of the disorder attendant on every hearing and the protests have never yet been satisfactorily investigated. So although all locals but 1248 have been counted, they have been counted as the result of an agreement among the tellers and not as the result of a thorough investigation of the protests which were originally filed. It should be said that the MFD adherents made the investigation of those protests very difficult by their conduct but it must be recognized that the tellers should never have been investigating their own votes.

Finally, on September 30, 1971, the final return of the tellers was filed on which all votes had been counted, save Local 1248.

The candidates reported to have won the election were the following:

| | |
|---|---:|
| *President—Budzanoski* <br> (His opponent, Antal, had received 4012 votes) | 4877 votes |
| *Secretary-Treasurer—Seddon* <br> (His opponent, Daniels, had received 4023 votes) | 4738 votes |
| *Member of International Executive Board— McCallister* <br> (His opponent, DeVince, had received 3803 votes) | 4873 votes |
| *Board Member Sub. District 1—Refosco* <br> (His opponents were Finley with 400 votes and Pellegrini with 377 votes) | 706 votes |
| *Board Member Sub. District 2—Nuccetelli* <br> (His opponents were Segedi with 855 votes and Werstler with 397 votes) | 1097 votes |
| *Board Member Sub. District 3—Vilcros* <br> (His opponent was Abbadini with 1039 votes) | 1223 votes |
| *Board Member Sub. Districts 4 & 5—Stover* <br> (His opponent was Chach with 933 votes) | 1601 votes |
| *Tellers—* | |
| *Baran* | 4545 votes |
| *Dews* | 4172 votes |
| *Kirkpatrick* | 4085 votes |
| (Their opponents were too numerous to mention here and it is unnecessary to mention the winners of all of the subordinate offices.) | |

On the basis of the final return the incumbent slate had won again but not overwhelmingly.

The Act of Congress already recited in Title IV, § 401(a) provides that every labor organization shall elect its officers

by secret ballot and § 401(c) provides that a labor organization shall provide adequate safeguards to insure a fair election, although § 401(e) requires adherence to the constitution of the organization unless it is inconsistent with the provisions of Title IV.

Section 402 provides that a court may declare an election void and direct a new election under the supervision of the Secretary if the court shall find upon a preponderance of the evidence, after trial, that a violation of § 401 may have affected the outcome of an election.

 We hold first that the union (labor organization) did not provide adequate safeguards to insure a fair election. The constitution violated the fundamentals of fairness and the union took no steps to remove the candidate officers from the conflicts existing under the constitution. It is fundamental in our law that a man cannot judge his own cause, or count his own votes or retain custody of his own ballots. The unfairness was built into the election procedure. An election attempted under this constitution was unfair by definition.

 Secondly, we hold that the lack of adequate safeguards resulted in an unfair election. Seven local unions protested the election in their locals for various reasons, mainly the lack of secrecy in voting. Yet there has never been present the ability to conduct a rational investigation of the protests. All but one local have been finally counted but whether the votes should have been counted has never actually been determined and whether Local 1248 should be counted has never been determined.

 We find that the lack of adequate safeguards may have affected the outcome of the election and the election will be set aside and a new election ordered under the supervision of the Secretary of Labor.

It should be noted that we do not accuse the District 5 officers of specific dishonesty but they were the victims of a defective constitution. They recog-

nized the conflict of interest inherent in it but nevertheless engaged in carrying out conflicting positions and in the process became impotent to conduct a fair election. The District officers, although there were other solutions available, saw as the only solution Labor Department supervision but the Labor Department was not bound to intervene and may have foreseen interminable conflict engulfing its own efforts. The mistake was in the constitution and a new election must be held.

This opinion shall be deemed to comply with Rule 52.